[No. 35168-1-I. Division One. July 8, 1996.]

CANRON, INC., *Appellant*, v. FEDERAL INSURANCE
COMPANY, *Respondent*.

*Mark S. Parris, William D. Maer, Daniel P. Zariski, Matthew R. Harris,* and *Heller Ehrman White & McAuliffe,* for appellant.

*Howard K. Todd, Mary F. O'Boyle,* and *Cusack & Knowles*; and *Jose E. Gaitan,* for respondent.

ELLINGTON, J. — At issue in this appeal is insurance coverage for release of hazardous wastes from the Western Processing Superfund site in Kent, Washington. The jury

concluded the insurer was prejudiced by delayed notice. Finding no evidence of actual prejudice, we reverse.

## I. Hazardous Waste Liability

Canron is a Canadian corporation that manufactured galvanized steel products in Vancouver, British Columbia. In the 1970s and 1980s, Canron shipped byproducts of the galvanizing process, including "spent pickle liquor" containing zinc, to Western Processing for recycling and disposal. In 1983, the Environmental Protection Agency (EPA) closed the Kent facility and designated it a Superfund site under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). The EPA found large quantities of zinc in the soil and groundwater.

On May 24, 1983, the EPA notified Canron it was a potentially responsible party (PRP) under CERCLA, and asked for records regarding shipments to Western Processing. Canron located records showing shipments beginning December 15, 1979, and notified the EPA of those shipments on June 2, 1983.

Between late April 1983 and July 1, 1983, the EPA attempted to prevent additional degradation of the soil and groundwater by removing some hazardous substances and stabilizing others. In January 1984, the EPA and the State of Washington Department of Ecology (DOE) notified Canron that Canron was potentially liable under CERCLA for releases of hazardous substances from Western Processing, and that if Canron failed to assume responsibility for cleaning up the site, the EPA and/or DOE would clean it up and sue Canron and the other PRPs to recover damages and costs.

In August 1984, Canron was sued by the United States, the State of Washington, a neighboring property owner, and (later) by co-defendants in the suit brought by EPA

and DOE. Canron ultimately agreed to pay approximately $3,000,000 to settle the claims.

## II. Insurance

From January 1971 through January 1977, Canron was insured by Federal Insurance Company under policies which covered property damage caused by an "occurrence." The first policy provided coverage from 1971-1974; the second provided coverage from 1974-1977. In relevant substance, the policies were identical. The contracts defined "occurrence" as:

> an event, or continuous or repeated exposure to conditions, which unexpectedly causes [property damage] during the policy period, provided the Insured did not intend or anticipate that [property damage] would result.

The policies required notice of any "occurrence":

> Upon the happening of any occurrence, written notice shall be given by or on behalf of the Insured to [Federal] or any of its authorized agents, as soon as practicable after notice thereof has been received by its executive officers at the Insured's headquarters.

Both contracts excluded coverage for pollutants under some circumstances:

> This policy does not apply to liability arising out of . . . [t]he discharge, disposal, release or escape of any contaminant, pollutant, or irritant into or upon the land, the atmosphere, or any water course or body of water unless such discharge, dispersal, release or escape is sudden and accidental.

When Canron was first informed it was a potentially responsible party in relation to the cleanup at Western Processing, Canron did not advise Federal of the potential claim because Canron's records did not show deliveries during the periods Canron was insured by Federal. However, some time before May 1984, Canron received

printouts from the EPA showing Canron had shipped its wastes to Western Processing as early as 1975. On May 15, 1984, Canron notified Federal of a potential claim related to the shipments going back to 1975, and on July 11, 1984, Canron informed Federal the EPA had sent a printout showing deliveries as early as 1972.

After an initial reservation of rights letter which raised (among other things) the delayed notice issue, Federal wrote Canron on February 27, 1985, and, "based on the allegations . . . and the facts as we now know them," asserted defenses to coverage for the claims against Canron. Federal conducted no investigation of the site; its determination was based on policy exclusions and coverage definitions. On September 19, 1991, Canron brought suit for declaratory relief and damages, claiming Federal was obligated to indemnify Canron for all sums for which it was liable as a result of the contamination at Western Processing. Federal's defenses included lack of notice, absence of an occurrence, and the pollution exclusion clause.

The case was tried in May 1994; the jury returned a verdict in favor of Federal, finding that Canron failed to notify Federal of occurrences as required by the policies, and that Federal was prejudiced by Canron's delayed notice. The jury did not reach the other issues. Based on the verdict, judgment was entered dismissing Canron's coverage claims. Canron's motion for judgment notwithstanding the verdict was denied. This appeal and cross-appeal followed.

## III. Delayed Notice – Prejudice

The policies required Canron to notify Federal of an occurrence "as soon as practicable." Canron does not dispute it delayed in notifying Federal of the post-1975 occurrences, since almost one year passed between the EPA's

first communication to Canron and Canron's first notification to Federal.[1]

 Noncompliance with a policy provision does not deprive the insured of the benefits of the policy unless the insurer demonstrates actual prejudice resulting from the insured's noncompliance. The burden of proof is on the insurer; prejudice is ordinarily a question of fact. *Oregon Auto Ins. Co. v. Salzberg*, 85 Wn.2d 372, 377, 535 P.2d 816 (1975).

Two issues arise on appeal relating to Canron's delayed notice.

A. Jury Instruction. Canron claims the trial court erred in giving Federal's proposed instruction on the prejudice issue, and in failing to give the instruction proposed by Canron. Canron's proposed instruction permitted the jury to find prejudice only if the late notice "caused actual prejudice to Federal's ability to investigate and defend Canron in the underlying claims." However, actual prejudice is not so limited. Canron's instruction failed to recognize that late notice may affect the insurer's ability to prepare and present coverage defenses as well, not just defenses to Canron's liability in the underlying litigation. Canron's proposed instruction was inaccurate, and was properly refused. *See Havens v. C & D Plastics, Inc.*, 124 Wn.2d 158, 167, 876 P.2d 435 (1994).

The instruction actually given was generally correct, but confusing. The instruction referred not to actual prejudice, but to prejudice to Federal's "rights." The instruction concluded, "if you find that Canron failed to give the required notice and that Federal's rights were prejudiced by Canron's failure then Canron is not entitled to coverage." While the giving of the instruction was not an abuse of discretion, especially in the absence of a proposed proper alternative, *Goodman v. Boeing Co.*, 75 Wn. App.

---

[1]Canron does dispute whether any delay occurred regarding the pre-1975 occurrences, since Canron notified Federal as soon as Canron itself received notice. However, Canron did not ask that the jury segregate the time periods for purposes of deciding the notice issue.

60, 75, 877 P.2d 703 (1994), *aff'd*, 127 Wn.2d 401, 899 P.2d 1265 (1995), we are skeptical about a jury's understanding of the concept of prejudice to a party's "rights." Instructions on this issue would ideally offer a more definitive approach. *See Hanson PLC v. Nat'l Union Fire Ins.*, 58 Wn. App. 561, 569-70, 794 P.2d 66 (1990). As is further discussed below, what is at issue is not an abstract right, but some concrete detriment, some specific advantage lost or disadvantage created which has an identifiable prejudicial effect on the insurer.

B. Substantial Evidence. The chief issue in this appeal is whether the verdict is supported by substantial evidence. This court may overturn the jury's verdict only if it was not so supported. *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 107-08, 864 P.2d 937 (1994). The record must contain a sufficient quantity of evidence to persuade a rational, fair-minded person of the truth of the premise in question. *See Bering v. Share*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986).

Canron argues the evidence was insufficient to support the jury's conclusion that Canron's delayed notice caused actual prejudice to Federal. The threshold question is, what constitutes actual prejudice for purposes of a delayed notice provision? No Washington case has directly answered this question. It is clear, however, that the insurer must demonstrate some concrete detriment resulting from the delay which harms the insurer's preparation or presentation of defenses to coverage or liability.

For example, in *Thompson v. Grange Insurance Ass'n*, 34 Wn. App. 151, 660 P.2d 307, *review denied*, 99 Wn.2d 1011 (1983), the insureds did not notify the insurer of their uninsured motorist claim until almost five years after the accident. The trial court held that the insurer was not prejudiced by the delay, and the Court of Appeals affirmed, because the insurer "never [came] close to proving actual prejudice." *Id.* at 163. The insurer failed to show that it could have recovered assets from the tortfeasor, even had the statute of limitation not expired, and failed

to introduce evidence that its insured was responsible for the accident.

In *Pulse v. Northwest Farm Bureau Ins. Co.*, 18 Wn. App. 59, 566 P.2d 577, *review denied*, 89 Wn.2d 1011 (1977), although the insurer was not notified of the claim until after the insureds' own attorney represented them at trial, the Court of Appeals reversed a decision in favor of the insurer on summary judgment when the insurer conceded it was "highly questionable whether [it] could have been more persuasive than the plaintiffs' counsel in keeping the amount of the damages down. At best, it would have chosen different counsel, would have demanded a jury, and may or may not have chosen a different judge to preside over the trial." *Id.* at 61.

Clearly, these decisions reject speculation, and require evidence of concrete detriment resulting from delay, together with some specific harm to the insurer caused thereby.

Courts applying Washington law have found a variety of evidence to be relevant to the issue of prejudice from an insured's noncompliance. *See Public Utility Dist. v. International Ins. Co.*, 124 Wn.2d 789, 805, 881 P.2d 1020 (1994) (insured settled without consent required by policy, but insurer's motion for summary judgment properly denied where liability of insured was extensive while coverage small, and settlement was court-approved as reasonable); *see also Time Oil Co. v. Cigna Property & Cas. Ins. Co.*, 743 F. Supp. 1400, 1416 (W.D. Wash. 1990) (insured delayed notice to insurer for almost three years, but insurer's motion for summary judgment denied and prejudice deemed an issue for trial; insurer argued it was unable to conduct a meaningful investigation or interview key witnesses who had lost their memories or died, but insured argued insurer never intended to investigate or defend and was not deprived of the opportunity to participate in the defense or settlement negotiations).

Additional factors other courts have considered relevant to the issue of prejudice from delayed notice include phys-

ical changes in the scene during the delay, the existence of reports concerning the occurrence, the preparation and preservation of demonstrative and illustrative evidence, and the ability of experts to reconstruct the scene. *See Hatco Corp. v. W. R. Grace & Co.*, 801 F. Supp. 1334, 1371-72 (D.N.J. 1992).[2]

Federal identified possible detriments resulting from Canron's delay, but presented no evidence of specifics and no evidence of resulting actual harm. The only direct evidence offered by Federal on the prejudice issue was the testimony of Steve Jakubowski,[3] whose entire testimony on the issue was as follows:

Q. When was notice received of these claims?

A. May 1984.

Q. And were you able to determine when it was that Canron first learned of these claims?

A. May of 1983.

Q. So that's one year?

A. Yes.

Q. Were you concerned about that?

A. Of course, yes.

Q. Why is that a matter of concern?

A. You do not have an opportunity to do a very early and complete and thorough investigation.

Q. Any other reasons?

A. Well, a lot of witnesses moved from the facility. A lot of documents are destroyed. And my understanding is that this particular site changed a lot once the government became involved.

Q. How did it change?

A. Lagoons were either filled in or moved. Some drums

[2]In New Jersey, the insurer must establish "appreciable prejudice."

[3]Jakubowski was Assistant Vice President of Chubb & Sons, which provided claims and underwriting services for Federal. Jakubowski had no personal knowledge of Federal's denial of Canron's claims, having become employed at Chubb & Sons in 1985, but he testified in lieu of other corporate witnesses.

had been taken from the facility. It was not in the same condition in 1984 that it was in 1983.

Q. How would that affect Federal's ability to investigate this claim?

A. You would have lost access to that information in conducting your investigation.

Q. And did that occur?

A. Yes.

While evidence at trial established that changes occurred continually at the site during the years Western Processing was in operation, and especially between May 1983 (when EPA notified Canron) and May 1984 (when Canron notified Federal), no evidence was introduced to isolate the changes which occurred during the delay period or identify the resulting harm to Federal. The evidence also established that some of Canron's records of shipments to Western Processing had been destroyed, but not during the delay period; no evidence was offered to show what records Jakubowski referred to as having been destroyed during the delay period, or how loss of those records affected Federal. No evidence was presented to show what witnesses became unavailable during the delay, or what information they might have had.

Other than the bare allegation that Federal's ability to investigate was compromised, Jakubowski did not explain how Federal was prejudiced. Moreover, once notified, Federal conducted no investigation. It is thus unclear how Canron's delayed notice detrimentally affected Federal's ability to investigate and caused actual prejudice.

Further, Canron was one of many companies which shipped to Western Processing; the EPA and DOE had extensively investigated the release of hazardous substances from the site, as had the other PRPs, including Boeing (which apparently had more than 50 percent responsibility for the second phase of the site remediation, compared with Canron's two percent). These investigations were apparently available to both Canron and

Federal, and were referred to at trial. Federal does not explain what further investigation was necessary but precluded, why other investigations were inadequate for Federal's purposes, or why expert reconstruction was unavailable.

Federal essentially argues that deprivation of the opportunity to conduct a prompt investigation is automatically prejudicial. Such an approach, however, would obviate the need to show actual prejudice, and Washington authorities do not support Federal's argument. In *Public Utility Dist. v. International Ins. Co.*, 124 Wn.2d 789, 881 P.2d 1020 (1994), the Supreme Court noted that prejudice is presumed only in extreme cases, citing *Felice v. St. Paul Fire & Marine Ins.*, 42 Wn. App. 352, 711 P.2d 1066 (1985), *review denied*, 105 Wn.2d 1014 (1986). The *PUD* court discussed the insurer's argument that prejudice should be presumed, and discussed cases from other states, concluding, "Because Washington law requires a showing of actual prejudice, we do not find these cases persuasive." *P.U.D.*, 124 Wn.2d at 804. Federal relies upon two cases involving delayed notice where prejudice was found as a matter of law, but neither involved Washington law, and both involved insurers who were notified of possible claims only after their most powerful defenses to coverage were materially compromised by the insureds' destruction of evidence. *See Colonial Gas Energy Sys. v. Unigard Mut. Ins. Co.*, 441 F. Supp. 765 (N.D. Cal. 1977); *West Bay Exploration Co. v. AIG Specialty Agencies*, 915 F.2d 1030 (6th Cir. 1990).

In contrast, Federal presented its defenses at length at trial. In support of its claims that the discharge of Canron's toxic waste was not "sudden and accidental" and was therefore excluded from coverage by the pollution exclusion clause, Federal offered extensive evidence of the conditions at the Western Processing site in the 1970s and 1980s. Federal also presented evidence that Canron's employees knew in the 1970s its waste was damaging to the environment and were aware of the inadequate measures

to protect the environment at Western Processing, that the damage was therefore not unexpected or unanticipated, and hence did not constitute an "occurrence" under the policies.

Trial occupied many days. If Federal was hindered in its investigation or presentation of defenses under the policies, or potential defenses of Canron, Federal had ample opportunity to encounter and demonstrate such prejudice. Federal offered no evidence of such hindrance. Jakubowski's testimony is insufficient, standing alone, to establish more than the parameters of possible prejudice, and Federal has cited this court to no other evidence of prejudice.[4] Nor has this court's independent examination of the record located such evidence.

Delayed notice which interferes with an insurer's ability to evaluate or investigate, as to coverage defenses or as to liability, may indeed cause actual prejudice. Lost witnesses or documents, or changes to the physical site, may affect the ability to investigate. However, prejudice will not ordinarily be presumed; what is lost or changed must be material, and not otherwise available or subject to reasonable reconstruction. Claims of actual prejudice require affirmative proof. *Castle & Cooke, Inc. v. Great American Ins. Co.*, 42 Wn. App. 508, 512, 711 P.2d 1108, *review denied*, 105 Wn.2d 1021 (1986). It is not sufficient merely to allege prejudice; an insurer must demonstrate specifics.

To establish actual prejudice resulting from delayed notice, an insurer must adduce affirmative proof of an advantage lost or disadvantage suffered as a result of the delay, which has an identifiable detrimental effect on the insurer's ability to evaluate or present its defenses to

---

[4]Federal claims the jury could have concluded that Canron's duty of notification arose during the years that Canron shipped its waste to Western Processing, because Canron knew that Western Processing's methods were environmentally unsafe, and therefore, that Canron's notification to Federal was delayed by many years, not just one, thus increasing the likelihood of prejudice. If true, such knowledge would trigger a duty to notify Federal under the policy only if made known to Canron's executive officers at its headquarters; Federal presented no evidence of such knowledge, and Canron presented evidence to the contrary.

coverage or liability. In the absence of such evidence, the jury's verdict was not supported by substantial evidence, and must be reversed.

## IV. Choice of Law

On cross appeal, Federal argues the trial court erred by applying the law of Washington, rather than Quebec. Federal argues the contract was entered into in Quebec and, therefore, Quebec law should apply.

██ ██ To resolve choice of law questions,[5] Washington courts have adopted the "most significant relationships" test, as described in the RESTATEMENT (SECOND) CONFLICT OF LAWS § 188 (1971). *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 100, 864 P.2d 937 (1994); *Potlatch No. 1 Fed. Credit Union v. Kennedy*, 76 Wn.2d 806, 459 P.2d 32 (1969). Under the most significant relationships test, when the parties have not expressly chosen the law to be applied, courts will apply "the law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties." RESTATEMENT (SECOND) CONFLICT OF LAWS § 188 (1971). Some of the contacts to be taken into account to determine which jurisdiction's law applies include:

 (a) the place of contracting,

 (b) the place of negotiation of the contract,

 (c) the place of performance,

 (d) the location of the subject matter of the contract, and

 (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

RESTATEMENT (SECOND) CONFLICT OF LAWS § 188(2) (1971).

---

[5]Courts need not engage in a choice of law analysis unless an actual conflict between the laws of the relevant states has been shown to exist. *Burnside*, 123 Wn.2d at 103. We assume for the purpose of this analysis that an actual conflict exists in this case. Federal asserts that under Quebec law no prejudice need be established, and the policy provisions are interpreted differently.

"These contacts are to be evaluated according to their relative importance with respect to the particular issue[,]" and in conjunction with the principles set forth in section 6 of the Restatement.[6] RESTATEMENT (SECOND) CONFLICT OF LAWS § 188(2) (1971).

Although Quebec was the place of negotiating and entering the contract, Quebec has no significant relationship to the issues in this case. Neither Canron nor Federal is a Quebec corporation. Canron's executive offices were located in Quebec when the contracts were entered, but Canron established a second executive office in Ontario in 1973 and the Quebec and Ontario offices merged in Ontario in 1979. Claims related to the occurrences in this case were handled from New Jersey and Los Angeles. Additionally, Canron executives testified they expected the law of the state in which damage or injury occurred would apply in cases involving coverage disputes. The ministerial acts of negotiating and executing the contracts do not amount to significant contacts in relation to the issues in this case.

Further, the parties understood the contracts covered multiple risks in multiple locations, including the galvaniz-

---

[6]Under section 6,

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

 (a) the needs of the interstate and international systems,

 (b) the relevant policies of the forum,

 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

 (d) the protection of justified expectations,

 (e) the basic policies underlying the particular field of law,

 (f) certainty, predictability and uniformity of result, and

 (g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) CONFLICT OF LAWS § 6 (1971).

ing plant in British Columbia.[7] The plant's wastes were shipped from British Columbia. British Columbia would best be considered the location of the subject matter in relation to this case, but neither party argues that British Columbia law applies, so it is presumed that British Columbia law is the same as Washington law. *See Barr v. Interbay Citizens Bank*, 96 Wn.2d 692, 698, 635 P.2d 441 (1981), 649 P.2d 827 (1982).

Washington has a paramount interest in the health and safety of its people. Washington bears the responsibility under CERCLA for ensuring the site cleanup[8] and will bear the burden if the site is not cleaned. The existence or absence of insurance proceeds can determine whether or not a hazardous waste site is remediated. Washington, therefore, has a significant interest in Canron's insurance coverage. Washington's contacts with the issues in this case are significant, while Quebec's are not. The trial court did not err when it applied Washington law.

## IV. Expert Testimony

■ Finally, because the issue may arise on retrial, we consider whether the trial court abused its discretion when it allowed Dr. Henry Landau to give opinion testimony as to when the pollution occurred. Under ER 703

> [t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

The admissibility of opinion evidence is largely within the discretion of the trial court. *Davidson v. Municipality of*

---

[7]There were multiple principal locations of risk under the insurance policies in question in this case, so Section 193 of the Restatement does not control. *See* RESTATEMENT (SECOND) CONFLICT OF LAWS § 193 cmts. a, b, c, and f (1971).

[8]42 USC § 9604(c)(3).

*Metro. Seattle,* 43 Wn. App. 569, 572, 719 P.2d 569 (1986). A trial court abuses its discretion only if it was exercised on untenable grounds or for untenable reasons. *Id.*

Federal argues on cross appeal that Canron failed to show that the opinion of Dr. Landau that contamination caused by Canron occurred between 1972 and 1977 was based upon facts reasonably relied upon by experts in his field. Landau, however, established a factual basis to support his conclusions about when contamination caused by Canron may have occurred and testified the materials upon which he relied were the sort relied upon by experts in his field for investigating sites such as Western Processing. The trial court did not err when it admitted the testimony.

Reversed and remanded for further proceedings.

KENNEDY, A.C.J., and WEBSTER, J., concur.

Reconsideration denied August 6, 1996.

Review denied at 131 Wn.2d 1002 (1997).